*United States v. McCray*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2020
No. 20-2545

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

TORRI MCCRAY,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of New York
No. 17-cr-147 — Lawrence J. Vilardo, *Judge*

ARGUED: JUNE 4, 2021
DECIDED: JULY 29, 2021

Before: LOHIER, NARDINI, *Circuit Judges*, and KOVNER, *District Judge.* *

---

* Judge Rachel P. Kovner, of the United States District Court for the Eastern District of New York, sitting by designation.

Defendant-Appellant Torri McCray appeals from a judgment of conviction and sentence entered following his guilty plea, in the United States District Court for the Western District of New York (Lawrence J. Vilardo, *J.*), to charges related to his possession with intent to distribute, and distribution of, fentanyl and butyryl fentanyl. McCray argues that the district court should have dismissed the count charging him with a violation of 21 U.S.C. § 841(b)(1)(B) premised on butyryl fentanyl. He maintains that butyryl fentanyl is not an "analogue" of fentanyl under § 841(b)(1)(B) because butyryl fentanyl is listed as a controlled substance on the federal drug schedules and is therefore excluded from the definition of "controlled substance analogue" in 21 U.S.C. § 802(32). Additionally, McCray argues that the district court clearly erred in finding that he was responsible through relevant conduct for a death and abused its discretion when enhancing his sentence pursuant to United States Sentencing Guidelines § 5K2.1. We find no merit in any of these claims. **AFFIRMED**.

---

TIMOTHY P. MURPHY, Assistant Federal Public Defender, *for* Marianne Mariano, Federal Public Defender for the Western District of New York, Buffalo, NY, *for Defendant-Appellant*

MONICA J. RICHARDS, Assistant United States Attorney, *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee*

---

WILLIAM J. NARDINI, *Circuit Judge*:

Defendant-Appellant Torri McCray pleaded guilty to one count of possession with intent to distribute and distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and one of two charged counts of possession with intent to distribute and distribution of 10 grams or more of butyryl fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). McCray now appeals from both his conviction and his sentence imposed in the United States District Court for the Western District of New York (Lawrence J. Vilardo, *J.*).

McCray first argues that the district court should have dismissed Count Two of the indictment[1] charging a violation of § 841(b)(1)(B) premised on butyryl fentanyl. Specifically, he maintains that the enhanced penalty provision in § 841(b)(1)(B)(vi), which applies to crimes involving 10 grams or more of "any analogue of [fentanyl]," does not extend to crimes involving butyryl fentanyl because butyryl fentanyl is not an "analogue" of fentanyl. McCray points to the definition of "controlled substance analogue" in 21 U.S.C. § 802(32), which

---

[1] Although the motion to dismiss concerned Counts Two and Three, Count Three was dismissed as part of the disposition and is not at issue on appeal.

3

excludes substances that are themselves listed as controlled substances on the federal drug schedules. Relying on this definition, he reasons that, because butyryl fentanyl is listed as a controlled substance, it is not a "controlled substance analogue" and therefore cannot be an "analogue" of fentanyl within the meaning of § 841(b)(1)(B)(vi). He further argues that any alternate definition of "analogue" that includes a listed controlled substance is unconstitutional for failure to provide adequate notice of the scope of illegal conduct.

McCray also asserts that the district court clearly erred and abused its discretion when applying a sentencing enhancement pursuant to United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") § 5K2.1. Specifically, McCray contends that the district court premised the enhancement on a clearly erroneous factual finding that a death resulted from his relevant conduct, and that it abused its discretion by applying the enhancement against the weight of the evidence.

We disagree as to both challenges. As explained more fully below, we affirm both McCray's conviction and sentence.

4

## I.    Background

On August 15, 2017, a grand jury returned a three-count indictment charging McCray with:

- Count One—possession with intent to distribute and distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and

- Counts Two and Three—possession with intent to distribute and distribution of 10 grams or more of butyryl fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

The charges arose from a series of controlled buys the Government made—using a confidential source ("the Buyer")—in June and July of 2017. During the first purchase, the Buyer purchased $600 worth of a substance later determined to be approximately five grams of fentanyl, butyryl fentanyl, furanyl fentanyl, and U-47700. During the second and third purchases, the Buyer purchased $1,000 and $1,400 worth of what testing revealed to contain approximately 11 grams and 15 grams of butyryl fentanyl. McCray was arrested on August 16, 2017.

McCray moved to dismiss Counts Two and Three of the indictment on the same grounds that he argues on appeal—that the definition of "controlled substance analogue" in § 802(32) excludes butyryl fentanyl from the scope of § 841(b)(1)(B)(vi)'s enhanced penalty. The magistrate judge (Jeremiah J. McCarthy, *M.J.*) agreed and recommended that the district court grant McCray's motion to the extent it sought to dismiss the enhanced penalty allegation. The Government objected, and the district court ultimately rejected the magistrate judge's recommendation and denied the motion to dismiss. The district court reasoned that § 802(32)'s definition of "controlled substance analogue" did not apply to § 841(b)(1)(B)(vi) because the penalty provision used the general term "analogue," not the specially defined term "controlled substance analogue." Considering the ordinary meaning of "analogue," the district court concluded that butyryl fentanyl was, for the purposes of § 841(b)(1)(B)(vi), not excluded from the definition of an "analogue" of fentanyl.

In February 2019, McCray pleaded guilty to Counts One and Two. In exchange, the Government agreed to move to dismiss Count Three. In the plea

6

agreement, McCray reserved the right to appeal the district court's denial of his motion to dismiss Counts Two and Three, and the Government reserved the right to argue for an upward departure from the contemplated Guidelines range of 60 months under U.S.S.G. § 5K2.1 for relevant conduct that resulted in a death.[2]

In preparation for sentencing and in anticipation of the Government's request for an upward departure pursuant to U.S.S.G. § 5K2.1, the district court held an evidentiary hearing at which the Government presented evidence that McCray's relevant conduct led to the fatal overdose of one of his customers (the

---

[2] U.S.S.G. § 5K2.1 provides:

> If death resulted, the court may increase the sentence above the authorized guideline range.
>
> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

"victim") on November 21, 2016. Specifically, the court heard the following details from the Buyer, who had been a customer of McCray before participating in the controlled buys and considered the victim to be his best friend.

The Buyer told the court that beginning in early 2016, he started purchasing one or two grams of what he thought was heroin from McCray daily. The drugs always were packaged similarly, were the same color and texture, and produced the same overall effect when used. Although he initially thought he was buying heroin, the Buyer came to believe that McCray was selling him fentanyl after he tested positive for fentanyl at least 30 times during his weekly outpatient drug tests and never tested positive for heroin. The Buyer testified that he told McCray three times that he had tested positive for fentanyl, but that McCray maintained that he was selling heroin.

The Buyer also told the court that he sometimes bought drugs from McCray for the victim, with whom he used every day and who would often accompany the Buyer to pick up the drugs. On two or three occasions, when McCray could not supply them, the Buyer and the victim obtained drugs from one other dealer,

but the Buyer testified that the last time they bought from that dealer was at least one or two months before the victim died. The Buyer stated that he and the victim were close enough that he would have known if the victim had obtained drugs from a third dealer and that to his knowledge the victim had not.

The Buyer testified that on the morning of November 21, 2016, the day the victim fatally overdosed on fentanyl, he and the victim bought about half a gram of drugs from McCray that resembled—in packaging, appearance, and smell—drugs McCray had previously sold. Both men were experiencing withdrawal, so on the way back to the Buyer's home they stopped to get high. They used again when they arrived. The Buyer testified that they remarked that the drugs seemed a little stronger than usual, and then the Buyer passed out. When he awoke a few hours later, the victim and the remaining drugs were gone. The Buyer left to look for the victim and his drugs but did not find either. The Buyer told the court that the police notified him of the victim's death later that evening, and that they also informed him that the victim had been found with a bag of chunky brown powder that matched the Buyer's description of his missing drugs. During the evidentiary

9

hearing, the Buyer identified the recovered bag as the one he purchased from McCray. The Buyer then testified that, in early 2017, he began to cooperate with the Drug Enforcement Administration in an effort to hold McCray responsible for the victim's death.

Following the evidentiary hearing, the district court issued a written decision, finding by a preponderance of the evidence that the victim's death resulted from McCray's relevant conduct and concluding that it therefore could increase McCray's sentence above the Guidelines range pursuant to U.S.S.G. § 5K2.1. On July 14, 2020, the court sentenced McCray principally to a 90-month term of imprisonment—departing upwards by 30 months. The court explained that it chose to depart not just because McCray's drug dealing led to a death, but also because McCray continued to deal even after the Buyer told him that the "heroin" he was selling was actually fentanyl.

## II. A substance can be an "analogue" of fentanyl under § 841(b)(1)(B)(vi) even if it is not a "controlled substance analogue" under § 802(32).

We review *de novo* a district court's denial of a motion to dismiss charges in an indictment. *United States v. Walker*, 974 F.3d 193, 201 n.3 (2d Cir. 2020). *De novo*

review similarly applies to questions of statutory interpretation, *United States v. Davis*, 961 F.3d 181, 186 (2d Cir. 2020), and challenges to the constitutionality of a statute, *United States v. Hassan*, 578 F.3d 108, 119 (2d Cir. 2008).

Section 841(b)(1)(B)(vi) imposes an enhanced penalty for a § 841(a)(1) drug crime where the crime involves "10 grams or more of a mixture or substance containing a detectable amount of any analogue of [fentanyl]." Neither § 841 nor the definitional statute—21 U.S.C. § 802—defines the term "analogue" or the phrase "any analogue of [fentanyl]." Where, as here, "a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993); *see Davis*, 961 F.3d at 187 ("We begin . . . with the language of the statute, giving the statutory terms their ordinary or natural meaning."). Webster's New Collegiate Dictionary defines "analogue" in the relevant chemistry context as "a chemical compound structurally similar to another but differing often by a single element of the same valence and group of the periodic table as the element it replaces." (9th ed. 1985). McCray does not dispute that butyryl fentanyl is an "analogue" of fentanyl under this definition—

11

and indeed, he expressly admitted that butyryl fentanyl is a fentanyl analogue during his guilty plea. Accordingly, we reject his challenge to the application of the enhanced penalty provision at § 841(b)(1)(B)(vi).

McCray urges us to look not to the dictionary to define the term "analogue" but to the definition of "controlled substance analogue" in § 802(32). Section 802(32) states that "the term 'controlled substance analogue' means a substance [] the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II . . . [but] does not include [] a controlled substance." McCray reasons that, under this definition, butyryl fentanyl is not an "analogue" of fentanyl because butyryl fentanyl is listed as a controlled substance[3] and § 802(32) excludes controlled substances from the definition of "controlled substance analogue." But nowhere in § 841(b)(1)(B)(vi) does the term "controlled substance analogue" appear; and where that specialized term does not appear, we

---

[3] At the time of McCray's offense conduct, federal drug schedules had temporarily designated butyryl fentanyl as a Schedule I controlled substance. *See* Schedules of Controlled Substances: Temporary Placement of Butyryl Fentanyl and Beta-Hydroxythiofentanyl Into Schedule I, 81 Fed. Reg. 29492 (May 12, 2016). Butyryl fentanyl remains a Schedule I controlled substance. *See* 21 C.F.R. § 1308.11.

have no reason to apply its specialized definition. Rather, Congress wrote § 841(b)(1)(B)'s enhanced penalty to apply to "any analogue of [fentanyl]." And, because Congress did not define "analogue" or "any analogue of [fentanyl]," we employ the word's ordinary meaning when interpreting the statute.

McCray contends that declining to use the definition of "controlled substance analogue" here would render § 802(32) superfluous, but that is plainly not the case. Congress used the term of art "controlled substance analogue" elsewhere in the subchapter, *see, e.g.*, 21 U.S.C. § 861(d)(1), and even elsewhere in § 841 itself. For example, just a few paragraphs later in § 841(b)(7)(A), Congress outlined a penalty structure for distributing a "controlled substance or controlled substance analogue" with the intent to commit a crime of violence. Elsewhere in § 841(g)(2)(A)(i), Congress defined the term "date rape drug" as "gamma hydroxybutyric acid (GHB) or any *controlled substance analogue* of GHB, including gamma butyrolactone (GBL) or 1,4-butanediol." (emphasis added). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks and alteration omitted). Thus, we do not nullify § 802(32) when we interpret § 841(b)(1)(B)(vi)'s "analogue" according to its ordinary meaning.

Finally, we reject McCray's argument that § 841(b)(1)(B)(vi) fails to provide him with sufficient notice that it imposes an enhanced penalty for the crimes of possessing and distributing 10 grams or more of butyryl fentanyl. "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited . . . ." *United States v. Williams*, 553 U.S. 285, 304 (2008). That is not the case here. Section 841(b)(1)(B)(vi) states that dealing in 10 grams or more of "any analogue of [fentanyl]" is subject to an enhanced penalty. McCray does not dispute that butyryl fentanyl is such an analogue under the ordinary meaning of the word.

Thus, we reject his challenge and hold that the statute provides him with fair notice and satisfies the Fifth Amendment's requirement of due process.[4]

## III. The district court did not clearly err or abuse its discretion in applying U.S.S.G. § 5K2.1.

We review for clear error both the district court's conclusion that McCray's November 21, 2016, sale was relevant to his offense conduct and the court's finding that the victim's death resulted from that sale. *See United States v. LaBarbara*, 129 F.3d 81, 86 (2d Cir. 1997) (employing clear error analysis of relevance determination for purposes of U.S.S.G. § 1B1.3); *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (reviewing factual finding at sentencing for clear error). We review the district court's decision to depart from the Guidelines range for abuse of discretion. *United States v. Fuller*, 426 F.3d 556, 562 (2d Cir. 2005).

McCray raises three related arguments in challenging the district court's application of the U.S.S.G. § 5K2.1 enhancement. First, McCray asserts that the district court clearly erred in finding that McCray's November 21, 2016, fentanyl

---

[4] As noted above, no statutory definition for "analogue" exists, and we are not convinced that § 802's definition of the separate phrase "controlled substance analogue," which does not appear in § 841(b)(1)(B)(vi), somehow applies.

15

sale was relevant to the 2017 offense conduct. He maintains that the intervening hiatus in sales and the differences in the details of the sales—including as to drug quantity, sale frequency, and the involvement of the Government—significantly distinguished the November 21, 2016, sale from the charged pattern of 2017 controlled buys. Second, McCray argues that, even if the November 21, 2016, sale was relevant conduct, the court (a) clearly erred in concluding that the Government proved by a preponderance of the evidence that McCray supplied the fatal drugs and then (b) abused its discretion by imposing an enhanced sentence that the weight of the evidence did not support. Third, McCray contends that, even if the Government's evidence met the preponderance standard, due process requires the Government to shoulder a higher burden of proof, such as by clear and convincing evidence or beyond a reasonable doubt. For the reasons below, we find each of McCray's arguments unpersuasive.

First, we reject McCray's argument that the court clearly erred in finding that the November 21, 2016, sale was relevant to his offense conduct. Pursuant to U.S.S.G. § 5K2.1, the district court may "increase the sentence above the

authorized guideline range" where it finds that death resulted from a defendant's relevant conduct. *See, e.g.*, *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000). Conduct is relevant where it constitutes "the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3. "Offenses . . . may . . . qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, cmt. n.5(B). Pertinent factors to this assessment include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.*

Here, the 2017 controlled buys occurred within McCray's existing drug-dealing relationship to the Buyer—involving the same drug (fentanyl), the same method of payment (cash), and the same principal characters (McCray and the Buyer) as the November 21, 2016, deal. Although the 2017 controlled buys occurred approximately six months after the Buyer's last 2016 buy and involved greater quantities of fentanyl than the Buyer's daily 2016 buys did, these

differences alone did not sufficiently transform the offense conduct into a distinct series of offenses. *See United States v. Perdomo*, 927 F.2d 111, 114 (2d Cir. 1991) (affirming a finding of relevance despite the relevant conduct involving "a large quantity of cocaine" and the offense conduct involving "a much smaller quantity"); *United States v. Santiago*, 906 F.2d 867, 873 (2d Cir. 1990) ("The fact that a period of some eight months had elapsed before a controlled buy could be arranged did not preclude a finding that [the defendant's] attempt to sell . . . for the 13th time was part of the same course of conduct as his prior 12 sales."). Similarly, the involvement of the Government in the controlled buys did not mark the beginning of a new and separate course of conduct. *See Perdomo*, 927 F.2d at 115 ("The 'same course of conduct' concept . . . looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be 'connected together' by common participants or by an overall scheme."). Thus, it was not clear error for the district court to find that the 2016 sales—including the November 21, 2016, sale—and 2017 controlled buys constituted an "ongoing series of offenses." U.S.S.G. § 1B1.3.

We next reject McCray's contention that the evidence presented to the district court was "so unreliable" that crediting it amounted to clear error. To begin, we reiterate that "[t]he ability of the district judge—who has seen and heard the witness—to make credibility determinations is superior to that of the appellate court." *United States v. Delacruz*, 862 F.3d 163, 176 (2d Cir. 2017). The district court here made specific credibility findings on the record, explaining that the Buyer "impressed the Court as a credible, knowledgeable, and concerned witness," "did not [waver] or hesitate," "showed no signs of confusion or doubt," and "did not attempt to overstate what he knew." Joint App'x at 474. The record amply supports the district court's assessment.

McCray specifically argues that the Buyer's character, testimonial inconsistencies, and courtroom identification of his missing bag of drugs render his entire testimony incredible. But we have previously stated that the sentencing court has "considerable discretion in resolving evidentiary inconsistencies" and that "a factfinder who determines that a witness has been inaccurate, contradictory and even untruthful in some respects may nevertheless find the witness entirely

credible in the essentials of his testimony." *United States v. Messina*, 806 F.3d 55, 64 (2d Cir. 2015) (internal quotation marks omitted). At best, McCray's arguments cast a faint shadow of doubt on the Buyer's credibility, yet our standard of clear error review does not permit us to reverse unless "[we] on the entire evidence [are] left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted); *accord Mathie v. Fries*, 121 F.3d 808, 811–12 (2d Cir. 1997). Because it was entirely "permissible" for the court to credit the Buyer's testimony about the events leading up to the victim's death, *Anderson*, 470 U.S. at 574, we find no clear error in the district court's decision to do so.

We also reject McCray's argument that the weight of the evidence did not support the district court's 30-month upward departure. As we stated in *United States v. Cordoba-Murgas*, the standard of proof for the district court's factual findings at sentencing, including when considering a departure under U.S.S.G. § 5K2.1 based on uncharged conduct, is a preponderance of the evidence. 233 F.3d 704, 710 (2d Cir. 2000). A district court should, however, take into

consideration the degree of proof satisfied beyond a preponderance when exercising its discretion to decide whether and how much to depart. *Id.* at 709.

Here, the Government's evidence easily surpassed the preponderance standard to show that McCray's November 21, 2016, sale resulted in the victim's death. It is undisputed that the victim died of a fentanyl overdose, and the Buyer's testimony provided a substantial basis upon which to conclude that McCray's fentanyl was responsible. The Buyer told the court that, among other things: McCray had been selling the victim and the Buyer fentanyl; the only drugs the victim had access to and injected on the day of his death were purchased from McCray; the drugs purchased resembled the drugs the Buyer and the victim had bought from McCray in the past, but were stronger than usual; the victim disappeared—along with the remaining drugs—while the Buyer was sleeping; and the bag of drugs recovered from the victim's person matched the bag the Buyer purchased from McCray. Having credited the Buyer's testimony, the district court did not clearly err when concluding that McCray's actions led to the victim's fatal overdose.

Furthermore, there is no indication in the record that the district court decided to upwardly depart by 30 months under U.S.S.G. § 5K2.1 "without regard to the weight of the evidence proving the relevant conduct." *Id.* at 708. Given the weight of the evidence showing McCray's culpability in the victim's death, we consider the 30-month upward departure to be only a moderate enhancement of McCray's sentence that the district court was well within its discretion to impose. We see no mismatch between the strength of the evidence presented and the court's carefully selected departure, and thus we see no abuse of discretion.

Finally, we reject McCray's argument that due process required the district court to apply a higher standard of proof than a preponderance of the evidence. *Cordoba-Murgas* forecloses this argument and clarifies that the application of a more stringent standard, such as a clear and convincing evidence standard, would in fact constitute error. 233 F.3d at 710.[5]

---

[5] Of course, judicial findings at sentencing cannot trigger increases in the statutory minimum or maximum penalties. *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 128 (2d Cir. 2017).

## IV. Conclusion

In sum, we hold as follows:

1. A substance can be an "analogue" of fentanyl for the purposes of 21 U.S.C. § 841(b)(1)(B)(vi) even if it is not a "controlled substance analogue" under 21 U.S.C. § 802(32).

2. Section 841(b)(1)(B)(vi) provides fair notice that dealing in 10 grams or more of a substance that is an "analogue" of fentanyl under the ordinary meaning of the word—even if that substance is not a "controlled substance analogue"—is subject to the subsection's enhanced penalty.

3. The district court did not clearly err in concluding that the November 21, 2016, sale was relevant to McCray's offense conduct or in finding that the victim's death resulted from the sale.

4. The district court did not abuse its discretion when departing upwards from the Guidelines range by 30 months based on the weight of the evidence that McCray sold the fentanyl that killed the victim.

5. The district court appropriately applied the preponderance of the evidence standard when making factual findings at sentencing.

We therefore **AFFIRM** the district court's July 22, 2020, judgment of conviction and sentence.